Brad A. Denton, #016454
Brad@DentonPeterson.com



1930 N. ARBOLEDA ROAD, SUITE 200
MESA, ARIZONA 85213
TELEPHONE: (480) 325-9900
FACSIMILE: (480) 325-9901
*Attorneys for Tresóna Multimedia, LLC*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Tresóna Multimedia, LLC, an Arizona limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Burbank High School Vocal Music Association, et al.,<br><br>Defendants. | Case No. 2:16-cv-04781-SVW-FFM<br><br>**PLAINTIFF'S OBJECTION TO BRETT CARROLL'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES** |
| Brett Carroll, an individual and employee of the Burbank Unified School District,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>Josh Greene, and individual; Squareplay, Inc. dba Squareplay Entertainments, a California corporation; and Does 1-10,<br><br>Third-Party Defendant. | Date:  December 19, 2016<br>Time:  1:30 p.m.<br>Judge:  Hon. Stephen V. Wilson<br>Ct. Room: 6 |

i

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES .......................................................................................iv

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................1

I.    Summary Judgment is Not Appropriate.............................................................1

  A.   Tresóna Has Standing. Alternatively, PEN Music Group and Royalty Network
Have Standing. ..........................................................................................................1

  B.   Carroll is not entitled to summary judgment on his defense of license. ...........5

  i.    The purported retroactive "license."................................................................5

  ii.   Tresóna's licenses to John Burroughs High School.........................................6

  C.   Tresóna's Claims Relating to Magic Are Not Time-Barred. ............................7

  1.    YouTube Videos. ...............................................................................................8

  2.    Advertisement from Tresóna. ..........................................................................10

  3.    PEN Music Group's Knowledge of Infringement in 2015. ............................11

  D.   Brett Carroll is Not Protected by Qualified Immunity. ..................................11

  i.    Carroll is not entitled to qualified immunity because he acted on behalf of the
private Booster Club. ...............................................................................................12

  ii.   The law Carroll violated is clearly established, and Carroll acted
unreasonably. ...........................................................................................................14

  a.    Carroll's reproduction and performance of copyrighted works without custom
arrangement licenses violates law that was clearly established. .............................15

  b.    Recording the copyrighted works without synchronization licenses violates
law that was clearly established...............................................................................18

  c.    Carroll's participation in performing and promoting copyrighted works
without grand/dramatic rights licenses violates law that was clearly established. 20

  iii.   Carroll is not entitled to qualified immunity because his actions were
unreasonable. ...........................................................................................................22

DENTON PETERSON, PC
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

II.    Conclusion. ........................................................................................................25

DENTON PETERSON, PC
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

1

## __TABLE OF AUTHORITIES__

2

**Cases**

3

*ABKCO Music, Inc. v. Washington*, 2011 WL 4953078 (E.D.Mich. 2011) .................20

*Agee v. Paramount Commc'ns, Inc.,* 59 F.3d 317 (2d Cir.1995) ...................................19

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)........................................................15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................1

*Brownmark Films, LLC v. Comedy Partners*, 800 F.Supp.2d 991 (E.D.Wis. 2011) .2, 3

*Buffalo Broad. Co., Inc. v. Am. Soc'y of Composers, Authors & Publishers,* 744 F.2d 917 (2d Cir.1984) ..................................................................................................19

Davis v. Blige, 505 F.3d 90 (2d Cir. 2007) ................................................................5, 6

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505 (9th Cir. 1985) .....20

*Freeplay Music, Inc. v. Cox Radio, Inc.*, 404 F. Supp. 2d 548 (S.D.N.Y. 2005) .........19

*Gershwin v. Whole Thing Co.*, 1980 WL 1182 (C.D.Cal. 1980) .................................20

*Kennedy v. City of Ridgefield*, 439 F.3d 1055 (2006)......................................14, 15, 22

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997 (2015)................1, 3, 4

*Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341 (9th Cir. 1988).......16

*Oddo v. Ries*, 743 F.2d 630 (9th Cir. 1984) ................................................................16

*Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004)................7

*Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F.Supp 1361 (N.D.Cal. 1995) ..................................................................................20

*Sobhani v. @Radical.Media,Inc.*, 257 F.Supp.2d 1234 (C.D.Cal 2003)......................16

Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137 (9th Cir. 2008).............2, 3, 4

*Wyatt v. Cole*, 504 U.S. 158 (1992)............................................................................12

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv

# TABLE OF AUTHORITIES

## (CONTINUED)

**Statutes**

17 U.S.C. § 101 ................................................................................................16

17 U.S.C. § 106 ..........................................................................................15, 19

17 U.S.C. § 106(4) ...........................................................................................20

17 U.S.C. § 501 (A) .........................................................................................16

17 U.S.C. § 507(b) .............................................................................................7

DP | DENTON PETERSON, PC
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Summary Judgment is Not Appropriate.

A court may grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] A trial court should not act "other than with caution in granting summary judgment" and may deny summary judgment where there is "reason to believe that the better course would be to proceed to a full trial."[2]

### A. Tresóna Has Standing. Alternatively, PEN Music Group and Royalty Network Have Standing.

"Until the passage of the Copyright Act of 1976, a copyright was seen as an indivisible bundle of rights, which were incapable of assignment in parts."[3] "The Copyright Act, however, eradicated much of the doctrine of indivisibility by permitting a copyright owner to transfer any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights to someone else."[4] The Ninth Circuit's 2015 case *Minden Pictures, Inc. v. John Wiley & Sons, Inc.* held that an exclusive license to grant others licenses confers standing to sue for infringement.

Tresóna has been granted "the exclusive, non-transferable right . . . to (i) issue Copyright Use Licenses to the Classification of Trade for Publisher Compositions," which include "Synchronization Licenses, Custom Arrangement Licenses, Grand Rights Licenses, [and] Dramatic Rights Licenses," for PEN Music Group.[5] The works covered by the PEN licensing agreement include (I've Had) the Time of My Life and

---

[1] Federal Rule of Civil Procedure 56(a).
[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).
[3] *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1002 (2015) (internal quotations and citations omitted).
[4] *Id.* (internal quotations and citations omitted).
[5] Mark Greenburg declaration ¶4; *See* **Exhibit H.**

1

Hotel California.[6] Additionally, Tresóna received from Royalty Network "the exclusive, non-transferable right . . . to issue Copyright Licenses to the Classification of Trade for Publisher Compositions," which include "Synchronization Licenses, Custom Arrangement Licenses, Grand Rights Licenses, [and] Dramatic Rights Licenses."[7] The works covered by the Royalty Network licensing agreement include Don't Phunk With My Heart.[8]

Carroll argues Tresóna does not have standing for these three works ((I've Had) the Time of My Life, Hotel California, and Don't Phunk With My Heart)[9] because the works are co-owned and Tresóna only received its exclusive rights from one of the co-owners. Carroll bases its argument on the widely "lampooned"[10] 2008 decision of *Sybersound Records, Inc. v. UAV Corp.*[11]

After the Ninth Circuit decided *Sybersound*, other courts and commentators heavily criticized it. One court explained:

> [T]he Ninth Circuit premised its decision in *Sybersound Records* on a rather narrow definition of exclusivity in the context of a jointly-owned copyright. Specifically, the Ninth Circuit reasoned that, because the other co-owners could use the copyright in question even after the assignment of the right by one co-owner to a third party, the assignment was by definition non-exclusive. … The *Sybersound Court,* however, presumed, without any basis in the law, that a co-owner of a copyright has only non-exclusive rights, preventing a co-owner from granting exclusive rights to a third party. Perhaps calling a unilateral grant by one co-owner to a third party "exclusive" involves a play on words that does not comport with our typical view of word "exclusive" in other contexts, but worshiping at the altar of

---

[6] Greenburg declaration ¶5.
[7] *Id.* at ¶6; Exhibit H.
[8] Greenburg declaration ¶7.
[9] Carroll does not include Magic in this analysis.
[10] *Brownmark Films, LLC v. Comedy Partners*, 800 F.Supp.2d 991, 997 (E.D.Wis. 2011).
[11] 517 F.3d 1137 (9th Cir. 2008).

DP DENTON PETERSON, PC
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

2

linguistic consistency would render a co-owner, whose interests in the copyright inherently are not limited to him or herself, all but powerless to prevent infringement of that copyright. More broadly, adopting the Ninth Circuit's reasoning would mean that a co-owner of a copyright can never effectively transfer a partial interest in a copyright. It is for these reasons that the *Sybersound Records* court's holding has been widely lampooned in several respected treatises. *See* 1–6 NIMMER ON COPYRIGHT § 6.10[A][2][d] ("[A] grant ... that characterizes itself as exclusive, should be treated as such ... [t]he contrary conclusion in *Sybersound* threatens to vitiate enforcement in general of joint works"); WILLIAM F. PATRY, PATRY ON COPYRIGHT § 5:103 ("The *Sybersound* court ... [has] made co-owners agunot, to each other until a Get, is obtained or a Bet Din, steps in and settles the matter ... [t]his isn't what Congress intended.")[12]

After the widespread criticism of *Sybersound*, the Ninth Circuit's 2015 decision in *Minden* abandoned *Sybersound*'s flawed reasoning. The *Minden* Court explained:

[T]he Copyright Act permits the copyright owner to subdivide his or her interest in what otherwise would be a wholly owned exclusive right by authorizing the owner to transfer his or her share, in whole or in part, to someone else. It specifies that the owner can transfer a right, or a share of such a right, via an assignment, exclusive license, or any other conveyance."[13]

The losing party in *Minden* argued that "because Minden was not the sole party authorized to issue licenses to the photographs, it cannot have held an 'exclusive license' that would permit it to bring suit under the Act."[14] This is exactly Carroll's argument here—that because other co-owners who did not provide Tresóna exclusive rights may have the right to issue licenses, Tresóna does not have an exclusive right. But in *Minden*, the Ninth Circuit rejected that argument:

This argument runs contrary to the divisibility principle embodied by the 1976 Act, and to the bulk of the caselaw and commentary in this field.

---

[12] *Brownmark*, 800 F.Supp.2d at 997 (internal quotations and citations omitted).
[13] *Minden*, 795 F.3d at 1002.
[14] *Id*. at 1004.

3

Wiley's argument is inconsistent with the notion that, under the 1976 Act, a single copyright, or right thereunder, may be divided between parties, with each co-owner entitled to sue to protect his or her interest in the right. As we recently explained in the context of copyright ownership, the word exclusive in the Act cannot mean that only sole owners possess exclusive rights. If an exclusive right could only be possessed by a sole owner of a copyright, a co-owner would be unable to bring an infringement action to protect his interest.

We see no reason why the divisibility principle should not apply with equal force when the interest granted is an exclusive license to grant licenses to others. The reason the Act prevents a holder of a "nonexclusive license" to use a copyrighted photograph from bringing an infringement action against others who use the same photograph is that such a licensee has no more than "a privilege that protects him from a claim of infringement by the owner" of the copyright. That is, because such a licensee has been granted rights only vis-à-vis the licensor, not vis-à-vis the world, he or she has no legal right to exclude others from using the copyrighted work, and thus no standing to bring an infringement suit. But when a licensee has been granted rights vis-à-vis the world—even if he or she shares those rights with another party, including the owner of the copyright—we see nothing in the Copyright Act that requires us to deem such an arrangement a mere "nonexclusive license" insufficient to give rise to standing to sue.[15]

Tresóna's rights are like those evaluated in *Minden*. Tresóna has been granted exclusive rights by a co-owner of the copyright. Tresóna has been granted exclusive rights vis-à-vis the world, even though they may be shared by owners of the copyright. Thus, Tresóna is the "legal or beneficial owner of an exclusive right under a copyright" and has standing to sue for the works. If *Sybersound* meant what Carroll claims, then the rationale of *Minden* would be completely vitiated.

To the extent this Court concludes that *Sybersound* could apply in this case, the issue is moot nonetheless. Tresóna has filed a motion to amend the complaint to add

---

[15] *Id.* at 1004 (internal quotations and citations omitted) (emphasis added).

4

PEN Music and Royalty Network to the action to resolve the issue. At a minimum, entry of summary judgment should be denied pending resolution of that motion.

**B. Carroll is not entitled to summary judgment on his defense of license.**

### i. The purported retroactive "license."

Carroll next argues a license he received from World Song, Inc. for (I've Had) the Time of My Life after Tresóna's claims accrued and even after the lawsuit had been filed eliminates Tresóna's claims.[16] Carroll is incorrect.

Carroll argues that the retroactive license is "valid," but that is not the point. The issue is not whether a license from another co-owner is valid (perhaps it is as between WorldSong and Carroll). The issue is whether a "retroactive license agreement" from a co-owner extinguishes Tresóna's already-accrued infringement claims.

Carroll has cited no binding law, and the law cited by Carroll does not directly address the issue. However, *Davis v. Blige*[17] does. Carroll here did exactly what the defendant in that case tried to do—try to avoid the consequences of an earlier infringement by getting a license from another rightsholder after an action was filed.

In *Davis*, the Second Circuit noted that settlements can "only waive or extinguish claims held by a settling owner" and that they have "no effect on co-owners who are not parties to the settlement agreement."[18] On the other hand, the Court noted, licenses and assignments "are prospective."[19] The Court reasoned, "The co-owner's right that would be extinguished by a rule permitting retroactive licenses or assignments—the right to sue for infringement—is a valuable one; indeed, it is one of the most valuable 'sticks' of the 'bundle of rights' of copyright."[20] "When the injury occurs, the injured

---

[16] Motion, p. 14.
[17] 505 F.3d 90 (2d Cir. 2007).
[18] *Id*. at 102.
[19] *Id*.
[20] *Id*. at 103.

5

party has the right to bring suit for all of the damages, past, present and future, caused by the defendant's act." But "[a] 'retroactive' assignment or license that extinguishes the accrued infringement claims of a non-consenting co-owner by traveling back in time to 'undo' an unlawful infringement destroys the co-owner's valuable and *vested* right to enforce her claim."[21] The Court continued, "A retroactive license or assignment that purports to eliminate the accrued causes of action for infringement held by a co-owner who is not a party to the license or agreement also violates the fundamental principle of contract law prohibiting the parties to a contract from binding nonparties."[22] Thus the Court concluded, "We have no doubt that Chambliss can release his own accrued claims of copyright infringement against Miller and his fellow defendants . . . But we know of no authority to sanction his attempt to release any rights Davis has against Miller, for they are not Chambliss's to release."[23]

Similarly, Tresóna's claims against Carroll are not WorldSong's to release (and indeed, the license from WorldSong does not even purport to release Tresóna's claims). Thus, summary judgment should be denied.

### ii.  Tresóna's licenses to John Burroughs High School.

Carroll argues that the Tresóna's licenses to John Burroughs High School for Hotel California and Don't Phunk With My Heart relieve Carroll of liability for those works. These works were performed by Burroughs High School at Burbank High School at an event called Burbank Blast hosted by Carroll and the booster club.[24]

Carroll misunderstands the nature of Tresóna's claims. The licenses referred to by Carroll are custom arrangement licenses. While Tresóna acknowledges John Burroughs received custom arrangement licenses for those two works, neither John

---

[21] *Id*. at 103 (emphasis in original).
[22] *Id*.
[23] *Id*. at 104.
[24] Greenburg declaration ¶8.

DENTON PETERSON, PC
ATTORNEYS · COUNSELORS · AT · LAW
1930 N. ARROLEDA ROAD, SUITE 200
MESA, AZ 85213

Burroughs nor Carroll received Grand/Dramatic rights licenses from Tresóna for the dramatic performances of those works.[25] As a result, the licenses provided Tresóna to John Burroughs for those two works are irrelevant to Tresóna's claims for infringement. Thus, as a matter of law, Carroll is not entitled to summary judgment.

## C. Tresóna's Claims Relating to Magic Are Not Time-Barred.

Carroll has failed to meet his initial burden to prove that Tresóna's claims relating to Magic are barred by the statute of limitations. Even if he had, fact issues preclude the entry of summary judgment on the issue.

Copyright infringement claims are barred when asserted more than three years after "the copyright holder has knowledge of a violation or is chargeable with such knowledge."[26] Thus, "the statute of limitations does not prohibit recovery of damages incurred more than three years prior to the filing of suit if the copyright plaintiff was unaware of the infringement, and that lack of knowledge was reasonable under the circumstances."[27]

Defendants provide no evidence that Tresóna had actual knowledge of Carroll's infringement of Magic more than three years before June 29, 2016, the date Tresóna filed its complaint.[28] To the contrary, it is undisputed that Tresóna did not discover Carroll's infringement until November of 2014. In November 2014, it was brought to Mr. Greenburg's (president of Tresóna) attention for the first time that the choirs at Burbank High School directed by Brett Carroll were involved in systemic copyright infringement. Upon learning of the possible infringement, Mr. Greenburg immediately began to research, primarily on YouTube.com, past performances by Carroll's Burbank

---

[25] *Id.* at ¶¶9-11.

[26] 17 U.S.C. § 507(b); *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir. 2004).

[27] *Id.*

[28] Doc. 1.

7

High School choirs. After finding performances of Carroll's choirs on Youtube.com, he reviewed the performances' contents to determine whether Carroll's choirs had performed custom arrangements of copyrighted works without licenses. As Mr. Greenburg looked into the issue, Mr. Greenburg discovered that Carroll's infringement was indeed widespread. During this process in November 2014, Mr. Greenburg discovered that Carroll had used at least 90 copyrighted works without obtaining required custom arrangement licenses.[29] The custom arrangement of Magic commissioned and led by Carroll and at issue in this action was among those works discovered by Mr. Greenburg in November 2014. Mr. Greenburg had no knowledge of Carroll's infringement of Magic (or the numerous other works that Carroll had infringed) before November 2014.[30]

Instead of arguing actual knowledge, Carroll argues that Tresóna should have known of his use of Magic before June 29, 2013 (1) because YouTube users posted three videos of 2011 performances of Magic in 2011 and 2012, and the videos have thousands of views; (2) because a Tresóna employee sent a blanket advertisement to Carroll to offering a YouTube partnership with Tresóna, and (3) because PEN (not Tresóna) sent an email in February 2015 regarding an infringing March 2014 performance of (I've Had) The Time of My Life (not Magic).[31] Each of these arguments is wrong.

### 1. YouTube Videos.

Tresóna's lack of knowledge of Carroll's infringing activities before November 2014 was more than reasonable under the circumstances. First, without some specific information of infringing activity, it is all but impossible for Tresóna to find specific

---

[29] Greenburg declaration ¶¶12-16.
[30] *Id*. at ¶¶17-18.
[31] Motion, pp. 6-8.

8

infringing activities. There are millions of audio and video performances of copyrighted works published on numerous online platforms like YouTube.com, vimeo.com, myspace.com, dailymotion.com, and others. Tresóna can find infringement on these platforms only if it has effective search criteria to use. In this case it did not.

With respect to the performance of Magic, the question is what could Tresóna have reasonably searched for before it learned about Burbank's infringement in November 2014. The title of the song was not enough. A search for "Magic" on YouTube returns about 59,000,000 results, most of which are videos of various magic tricks. Even if you search for "Magic Olivia Newton John" (about 103,000 results) or "Magic John Farrar" (about 2,200 results), no results of any show choirs performing custom arrangements of that work appear in the first ten pages of results.[32] Thus, even searching specifically for Magic would not have produced the YouTube video entitled "Burbank In Sync 2011 – 'Levitate / Magic.'"—let alone the other videos which did not even contain "Magic" as part of their title.

To complicate matters further, when YouTube users post show choir performances to YouTube, they do not typically include in the metadata a list of the included copyrighted works. Indeed, users have an incentive to omit such information, as including it would make it easier for rightsholders to identify infringing performances. Instead, as happened in this case, users identify such videos with titles such as, "BHS VMA In Sync 'Rainmaker' Prelims Pt. II" and "Burbank 'In Sync' 2011."[33] There is nothing in the metadata accompanying Carroll's cited videos that would suggest that the video includes a custom arrangement of any copyrighted work controlled by Tresóna, including Olivia Newton-John's Magic.[34] Indeed, the fact that

---

[32] Greenburg declaration ¶¶27-28.
[33] *See* Motion, p. 7, n. 6 (referencing https://www.youtube.com/watch?v=YaiTdy7p_oI); *see also* Carroll Declaration, Ex. 9.
[34] Greenburg declaration ¶25.

DENTON PETERSON, PC
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

these videos barely have over 25,000 views combined shows they are obscure under YouTube standards (the top two Olivia Newton-John Magic videos show each has been viewed about 1,200,000 and 1,500,000 times respectively).[35]

Thus, the only practicable way to search for infringement for school show choir performances is search for performances by a particular school. But before November 2014, Tresóna had no reason to suspect that Carroll was commissioning, copying, distributing, and performing custom arrangements of copyrighted works without permission. As soon as Mr. Greenburg learned of potential infringement, he began a thorough and diligent search for Burbank High School performances.[36] By December 2014—only one month later—Tresóna had reached out to Burbank High School officials to address the issue of infringement.[37] Thus, Tresóna's lack of knowledge was not only reasonable before discovery, but Tresóna immediately and diligently addressed the issue once it was discovered.

### 2. Advertisement from Tresóna.

The advertisement from Mike Smith (an employee of Tresóna at the time) attached to Carroll's Declaration as Exhibit 17 does not change this. The email states that in addition to licensing custom arrangements, "Tresóna is also a 'Premier Partner' with YouTube." It continues, "All of our licensing clients are eligible for their own YouTube Partner Channel from Tresóna. There is no charge for this service." It concludes, "To get started with the creation of a YouTube Partner Channel, please call Tresóna today at 877-347-2543 or email us to get started and we'll contact you!"[38]

---

[35] Greenburg declaration ¶26; https://www.youtube.com/watch?v=Jj5vagsGC38 and https://www.youtube.com/watch?v=DnkHf069fvA; *see* **Exhibit S**.

[36] Greenburg declaration ¶¶30-32.

[37] Greenburg declaration ¶33; *see* Letter from Tresóna dated December 10, 2014, **Exhibit A**.

[38] Carroll declaration, Ex. 17.

DENTON PETERSON, PC
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

Carroll argues that this email shows that "Tresóna knew, on November 28, 2012, that videos of Burbank High School show choirs were available on YouTube."[39] It does no such thing. At the time, Tresóna was developing a new feature of its business, and this email was a blanket advertisement sent to numerous clients on a mailing list. The email merely advertised a new opportunity that was available to "[a]ll of [Tresóna's] licensing clients." The email does not say—expressly or impliedly—that Tresóna knew that videos of Carroll's Burbank choirs were available on YouTube.

### 3. PEN Music Group's Knowledge of Infringement in 2015.

Carroll's last argument is that Tresóna should have known of Carroll's infringement in 2011 because PEN knew of infringement by 2015. That makes no sense. It is true that on February 25, 2015, PEN's president, Michael Eames, wrote an email regarding infringement of (I've Had) The Time of My Life (not Magic). But Mr. Eames only knew about it in 2015 because, as stated above, Mr. Greenburg had discovered the infringement in late 2014.[40] At any rate, an email in 2015 about infringement discovered in 2014 does not shed any light about whether infringement could reasonably have been discovered in 2011.

It is undisputed that Tresóna did not discover Carroll's infringement until November 2014. Before November 2014, Tresóna had no reason whatsoever to suspect Burbank had infringed Magic or any other work and its lack of knowledge was more than reasonable under the circumstances. As a result, Carroll has not met his burden to prove Tresóna's claims relating to Magic are barred by the statute of limitations.

### D. Brett Carroll is Not Protected by Qualified Immunity.

Carroll's final argument—that summary judgment should be granted in Carroll's favor on the basis of qualified immunity—is also wrong. First, in addition to acting for

---

[39] Motion, p. 7.

[40] Greenburg declaration ¶38.

11

the school district, Carroll is liable for his actions on behalf of the privately operated Burbank High School Vocal Music Association Booster Club. And even if he were acting exclusively as a government official, qualified immunity does not apply because Carroll's conduct violated clearly established law.

### i. Carroll is not entitled to qualified immunity because he acted on behalf of the private Booster Club.

The doctrine of qualified immunity applies only to people acting as public employees, and the Supreme Court has refused to apply it to people acting as private parties.[41] Carroll's entire qualified immunity argument is based on the untrue assertion that he was acting solely in his role as a publicly employed teacher.

Carroll argues that the Burbank High School Vocal Music Association is merely "the name used by Burbank High School to refer to its vocal music program—encompassing both the curricular classes and the extracurricular activities, including its competitive show choirs" and that thus his "role in the Burbank High School Vocal Music Association is part of his duties as a public employee."[42] He argues that the separate booster club—a 501(c)(3) nonprofit corporation—is called the "Burbank High School Vocal Music Association *Boosters Club*."[43] However, this is untrue.

In the Arizona case between the same parties and involving the defendants' failure to license other copyrighted works, Carroll and the Association Defendants filed separate motions to dismiss on various grounds. The Association (booster club) Defendants attached a booster club Information Sheet to their Reply to their motion[44] that provides:

---

[41] *Wyatt v. Cole*, 504 U.S. 158, 168 (1992).

[42] Motion, pp. 8-9.

[43] Motion, p. 20 (emphasis added).

[44] A copy of Volunteer Defendants and Burbank VMA Boosters' Reply to Plaintiff's Response to Motion to Dismiss is attached hereto as **Exhibit B.**

12

**WHAT IS THE VMA?**

The Burbank High School VMA (Vocal Music Association) is a 501(c)3 non-profit organization established to fundraise and sponsor traveling competitive show choirs.  The VMA is a third party entity separate from the BUSD school district and the classroom.  The BHS VMA also assists the BHS Choir Program by funding the gap not covered by community-based fundraising and limited district funds; providing Event Management for all performances and community-based fundraising opportunities; and providing Money Management for the BHS choir program. For more info, refer to the **BHS VMA Fact Sheet** and the **BHS Choir Program Fact Sheet**.

Thus, the booster club's own documents contradict Carroll's story. The Burbank High School Vocal Music Association is the booster club. It is the "third-party entity separate from the BUSD school district and classroom" that supports the choir program. And Brett Carroll is the director of this separate third-party entity.[45]

Regardless of what the booster club is called, Carroll in fact acts for the Booster Club. For example, Carroll is the person who decides and hires the choreographers, arrangers and accompanists who are paid by the booster club.[46] He decides which competitions the choirs will attend and is involved in the related travel arrangements made by the booster club.[47] Carroll directs contractors hired and paid by the booster club, such as choreographer Randy Sage.[48] Carroll selects and requests the custom arrangements for the booster club to pay—in fact, he testified that he asked Josh Greene to create the musical set that included Magic, that Mr. Greene communicated directly with Carroll about it, that Greene submitted invoices to Carroll, and that Carroll would pass that invoice along to the booster club.[49]

---

[45] *See* printout of Burbank Unified School District (**Exhibit C**) and Biography of Brett Carroll (**Exhibit D**); Objections and Responses of Defendants Burbank High School Vocal Music Association Boosters Club to Plaintiff Tresóna Multimedia LLC's First Set of Interrogatories, p. 5 (**Exhibit E**).

[46] *See* Carroll deposition, **Exhibit F**, at 58:3-59:19.

[47] Exhibit F at 63:4-64:13.

[48] Exhibit F at 123:5-124:13.

[49] Exhibit F at 261:9-25.

DENTON PETERSON, PC
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

Additionally, just a few days ago Carroll produced a document demonstrating that the booster club looked to Carroll for guidance and that Carroll gave it, that the booster club is separate from the school district, that the District is dealing with Mark Greenburg and Tresóna for Burroughs, and that Carroll is the one who decided that the Burbank Vocal Music Association did not need to obtain licenses for its show choir. In preparation for this Response, Tresóna's counsel addressed the document with counsel for Carroll, after which counsel for Carroll claimed the document was inadvertently disclosed and demanded that it be returned and destroyed. That document is now the subject of a Motion for Determination of No Privilege and Supplement to Objection to Brett Carroll's Motion for Summary Judgment being filed contemporaneously herewith. Upon resolution of that motion (which will be most easily understood if read in conjunction with this Objection), this argument is hereby supplemented by the information contained in that document.

With this evidence, a factfinder could, and almost certainly would, conclude that Carroll's actions were taken on behalf of the privately operated booster club. As a result, at a minimum, summary judgment on the basis of qualified immunity is inappropriate.

### ii.  The law Carroll violated is clearly established, and Carroll acted unreasonably.

In addressing qualified immunity, courts "determine whether—resolving all disputes of fact and credibility in favor of the party asserting the injury—the facts adduced at summary judgment show that the officer's conduct violated a constitutional right."[50] If there is such a violation, "the court determine[s] whether, at the time of the violation, the constitutional right was 'clearly established.'"[51] "A right is clearly

---

[50] *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1060 (2006).
[51] *Id*.

established if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right."[52] "This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."[53]

Carroll argues that he should be entitled to qualified immunity because (1) his conduct was not barred by clearly established law and (2) because he acted reasonably. Carroll is wrong, and as a matter of law he is not entitled to qualified immunity.

### a.    Carroll's reproduction and performance of copyrighted works without custom arrangement licenses violates law that was clearly established.

Carroll commissioned, copied, distributed, and performed custom arrangements of Magic and (I've Had) the Time of My Life.[54] He did that without first getting permission.[55] In the industry, licenses for derivative show choir works are known as custom arrangement licenses.[56]

Carroll's conduct violates clearly established copyright law. 17 U.S.C. § 106 declares:

> [T]he owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; …[and] (4) in the case of literary, musical, dramatic, and

---

[52] *Id*. at 1060-61(internal quotations and citations omitted).

[53] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[54] *See* videos submitted with Carroll's Motion; *see* Exhibit I and J; *see* Exhibit F at 118:9-119:16; 189:3-18.

[55] Greenburg declaration ¶44; s*ee* Email from M. Bertram at **Exhibit V**.

[56] Greenburg declaration ¶45; *see* Expert Report **Exhibit U.**

DENTON PETERSON, PC
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

choreographic works, pantomimes, and motion pictures and other audiovisual works, to <u>perform</u> the copyrighted work publicly . . . .[57]

17 U.S.C. § 101 defines a "derivative work" as one "based upon one or more preexisting works, such as a … <u>musical arrangement</u>…."[58] "Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 … is an infringer of the copyright."[59]

The Ninth Circuit has long held that use of a derivative work without permission constitutes infringement.[60] And this Court held in 2003 that "if a work is derived from a previous work, and the new work thereby infringes a copyright in the previous work, then the new work is an unauthorized (and infringing) derivative work."[61]

The arrangements of Magic and (I've Had) the Time of My Life are indisputably derivative works—musical arrangements incorporating the original words and melodies of the original works into a full orchestration for five-voice choir (Soprano, Alto, Tenor, Bass, and Solo) plus brass, woodwinds, piano, synthesizer, and electric guitars.[62] It is clearly established that creating and using such an arrangement without permission constitutes infringement.

Not only was this type of arrangement clearly established legally at the time of infringement in 2011 and 2014, it is clearly established in the industry. In February 2006, the Choral Journal—the publication for The American Choral Director's

---

[57] (Emphasis added).

[58] (Emphasis added).

[59] 17 U.S.C. § 501 (A).

[60] *Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984) ("As derivative works they necessarily infringe the copyrights"); *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341 (9th Cir. 1988) ("appellant has prepared a derivative work and infringed the subject copyrights").

[61] *Sobhani v. @Radical.Media,Inc.*, 257 F.Supp.2d 1234, 1238 (C.D.Cal 2003).

[62] *See* **Exhibits I** and **J**.

16

Association, of which Carroll is a member[63]—published an article called *The Jazz Choir Goes Legit: Copyright Law for the Vocal Music Educator*.[64] That article explains:

> Educators have developed some bad habits. Currently, many of the arrangements produced and performed in educational institutions throughout the country are written by individuals who have not secured permission from the copyright owners. Also more institutions have begun recording and distributing recordings of their groups. Too often, these recordings feature illegally produced arrangements. Further, many recordings are unlicensed and the proper fees have not been paid to the copyright holders.
>
> We have a legal and moral obligation to "clean up our act." We risk litigation against our institutions and ourselves and setting a bad example for our students by stealing the intellectual property of musicians and lyricists of their heirs.
> …
> While we teach choral music, we also are teaching life lessons. We owe it to ourselves and our students to "go legit" in our choral music classrooms . . . We lament the degrading moral fabric of our culture and society yet we're willing participants in its decline. We talk about stealing from others when the evidence of our own larceny is spread across the piano. This hypocrisy is obvious to our students. The time has come to stop rationalizing our wrongdoings and do what it takes to "go legit" in our classrooms.

The same publication addressed copyright licensing issues in August 2009. That article, called *Copyright, Know the Law*, stated, "In case you do not know, any arrangement of a copyrighted musical work made without the permission of the copyright owner is a copyright infringement."[65]

Further, schools routinely obtain such licenses. Since 2010, more than 4,000 schools have requested custom choral arrangements of copyrighted music through

---

[63] Exhibit D.
[64] *See* **Exhibit K**.
[65] *See* **Exhibit L**.

17

Tresóna.[66] In fact, no other school show choir director in the nation has asserted to
Tresóna that licenses for custom arrangements of copyrighted works are unnecessary.
This further shows that the law is clearly established.[67] And the only other high school
show choir in the Burbank School District, John Burroughs, obtains its custom
arrangement licenses from Tresóna and has done so for years.[68]

Carroll argues the law was not clearly established because in 2015—after the
infringements at issue occurred—Michael Eames, president of PEN, "admitted that the
industry practice prior to that point had been that when schools would seek permission
to make new arrangements of songs, publishing companies would not make these
requests a priority and would not respond, and that they thereby 'enabled the show
choir and school ensemble community to proceed.'"[69] Carroll's argument misses the
point. Mr. Eames did not say that the law was unclear. He merely said that some
publishers had been slow to issue custom arrangement licenses, which led some show
choirs to "proceed with arrangements without permission." That does not bear on the
clarity of the law, which cannot be questioned. By creating, copying, distributing, and
performing derivative works without custom arrangement licenses, Carroll violated
clearly established law, and summary judgment should be denied.

### b.    Recording the copyrighted works without synchronization licenses violates law that was clearly established.

Tresóna asserts that Carroll infringed the copyright for Magic and (I've Had) the
Time of My Life by videotaping performances of the performances of those works
without permission. Law requiring permission from rightsholders to create and
distribute audiovisual recordings of copyrighted works is clearly established. 17 U.S.C.

---

[66] Greenburg declaration ¶50.
[67] *Id*. at ¶51.
[68] *See* **Exhibit T;** Greenburg declaration ¶53.
[69] Motion, p. 22.

DENTON PETERSON, PC
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

§ 106 provides that a rightsholder "has the exclusive rights to . . . reproduce the copyrighted work in copies of phonorecords." Permission to synchronize a musical composition into an audiovisual work is granted through a synchronization license.[70]

> The Southern District of New York has summarized the applicable law:
>
> The Copyright Act does not explicitly define or confer any separately-labeled "synchronization" right. It does, however, give the copyright holder the exclusive right (among others) "to reproduce the copyrighted work in copies or phonorecords." 17 U.S.C. § 106(1). As the Second Circuit has described it, "the so-called synchronization right, or 'synch' right ... [is] the right to reproduce the music onto the soundtrack of a film or a videotape in synchronization with the action. The 'synch' right is a form of the reproduction right also created by statute as one of the exclusive rights enjoyed by the copyright owner." *Buffalo Broad. Co., Inc. v. Am. Soc'y of Composers, Authors & Publishers,* 744 F.2d 917, 920 (2d Cir.1984). The Court went on to note, "When [a] producer wishes to use outside music in a film or videotape program, it must obtain from the copyright proprietor the 'synch' right in order to record the music on the soundtrack of the film or tape." *Id.* at 921. Such a license is necessary because "incorporating a copyrighted sound recording into the soundtrack of a taped commercial television production infringes the copyright owner's exclusive right of reproduction."

*Agee v. Paramount Commc'ns, Inc.,* 59 F.3d 317, 319 (2d Cir.1995).[71] Thus, the law is clearly established that reproducing music with a video requires a synchronization license, and it has been for decades.

Carroll asserts that he did not "do anything that infringed synchronization rights."[72] But he concedes that performances of the Burbank High School show choirs were videotaped by a videographer, who sold DVDs to students' families for $30.[73] As

---

[70] Greenburg declaration ¶54.
[71] *Freeplay Music, Inc. v. Cox Radio, Inc.*, 404 F. Supp. 2d 548, 551 (S.D.N.Y. 2005)
[72] Motion, p. 22.
[73] Motion, p. 23.

DENTON PETERSON, PC
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

director of the Burbank show choirs and the go-to resource for the booster club's copyright compliance, [74] Carroll surely had the authority to prevent commercial videographers from making infringing audiovisual recordings. Accordingly, Carroll participated in the infringement, and he is liable for such conduct. [75]

### c. Carroll's participation in performing and promoting copyrighted works without grand/dramatic rights licenses violates law that was clearly established.

Tresóna also asserts that Carroll infringed copyright by failing to obtain permission to perform the works at issue in this litigation in a dramatic performance without permission. In the industry, permission to perform a musical work in a dramatic fashion requires grand right/dramatic right licenses. [76]

The law regarding grand/dramatic rights is also clearly established. 17 U.S.C. § 106(4) provides that a rightsholder has the right to authorize, "in the case of literary, <u>musical</u>, <u>dramatic</u>, and <u>choreographic</u> works, pantomimes, and motion pictures and other audiovisual works, to <u>perform</u> the copyrighted work publicly" This Court declared as early as 1980, "There are two basic tests to determine whether grand rights are required. Grand rights are required if: (1) a song is used to tell a story, or (2) a song is performed with dialogue, scenery, or costumes." [77]

---

[74] Exhibit F at 7:16-18; *see also* document at issue in the Motion for Determination of No Privilege and Supplement to Objection to Brett Carroll's Motion for Summary Judgment filed contemporaneously herewith.

[75] *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Serv., Inc.*, 907 F.Supp 1361, 1373 (N.D.Cal. 1995) ("Liability for participation in the infringement will be established where the defendant, 'with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another'").

[76] Greenburg declaration ¶55.

[77] *Gershwin v. Whole Thing Co.*, 1980 WL 1182, 4 (C.D.Cal. 1980); *see also ABKCO Music, Inc. v. Washington*, 2011 WL 4953078, 3 (E.D.Mich. 2011) (*citing Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 511 (9th Cir. 1985) ).

In this case, both of those requirements are met. The works were performed in a way that tells a story, and does so with scenery and costumes. Additionally, the arranger of "Rainmaker" (which includes Magic) actually described the story:

> MAGIC is the closer to a show called "Rainmaker." It's about a Stranger who shows up in a small town during the Dustbowl with the promise of Rain if the people will just have a little Faith. He performs several miracles, and many of the townsfolk begin to believe, but the Sheriff isn't buying it – and the rain still isn't coming. Finally the Sheriff drops to his knees, acknowledging his lack of faith, and asks what he needs to do to Believe. And with that, the rain comes.[78]

In the same email, Mr. Greene described the story of "80's Music Medley" (which includes ("I've Had) the Time of My Life) as follows:

> (I'VE HAD) THE TIME OF MY LIFE is the final eight bars of the 80's Movie Medley in a very meta show about… Show Choir. The opening number is actually the "Closing Number" of the previous year's show. A girl in the audience is enthralled, and watches the group win Grand Champion. She then comes onstage and auditions with several other kids for "next year's" show. Everyone makes the group except one kid who is relegated to Stage Crew. The actual Stage Crew come out to do a number with him, then there's some talk about how Show Choir relies too much on props, costumes and gimmicks. They just need to SING! The Stage Crew kid comes out and tells them they need to wrap up, and the ony way to do that quickly is with a montage… An 80's Movie Montage! At the end of the song, the director comes out while the kid sing (I'VE HAD) THE TIME OF MY LIFE, joining in for a moment before taking them to the TAG! During the Tag, our original girl appears and sings about al she's learned in Show Choir… that it's not about winning and losing, it's about friendship, hard work, and doing your very best.[79]

---

[78] Email from Josh Greene dated August 25, 2016; *see* **Exhibit M**; Greenburg declaration ¶3.

[79] *See* Exhibit M.

Obviously, these performances "tell a story" and "include dialogue, scenery, or costumes." That is confirmed by reviewing the videos of the performances.[80] Carroll himself admitted these story elements in his deposition—despite repeated improper speaking objections and interruptions by his attorney.[81] Thus, Carroll violated clearly established law by performing and promoting the works without proper licenses.

Carroll argues that the law is not clearly established because there is no court case addressing this concept in the specific context of a school show choir. However, the Ninth Circuit has explained: "In order to find that the law was clearly established we need not find a prior case with identical, or even materially similar facts. Our task is to determine whether the preexisting law provided the defendants with fair warning that their conduct was unlawful."[82] The preexisting law—by this very Court no less—is more than "sufficiently clear that a reasonable official would understand that what he is doing violates that right."[83]

### iii. Carroll is not entitled to qualified immunity because his actions were unreasonable.

Carroll incorrectly argues that even if Tresóna's rights were clearly established, he should be entitled to qualified immunity because he acted reasonably. "[I]f an officer makes a mistake in applying the relevant legal doctrine, he or she is not precluded from claiming qualified immunity so long as the mistake is reasonable. That is, if the officer's mistake as to what the law requires is reasonable, the officer is entitled to the immunity defense."[84] But Carroll cannot argue here that he made a reasonable "mistake."

---

[80] *See* videos submitted with Carroll's Motion.
[81] Exhibit F at 231:2-243:25.
[82] *Kennedy*, 439 F.3d 1055, 1066 (internal quotations and citations omitted).
[83] *Id*. at 1060-61(internal quotations and citations omitted).
[84] *Id*. at 1061 (internal quotations and citations omitted).

22

First, the law is clear, and it has been for decades. This is evidenced by the thousands of choirs and other performing arts groups that acquire such licenses.[85] To Tresóna's knowledge, Carroll is the only show choir director in the nation refusing to obtain licenses for his school's performances.[86]

Second, for more than 10 years the show choir industry has acknowledged the need to obtain correct licenses. As noted above, the Choral Journal published articles in both 2006 and 2009 acknowledging licensing requirements, advocating their acquisition, and informing show choir directors how to obtain them.[87] Further, the National Association for Music Education includes a web link to a webpage that explains the need to obtain a license for custom arrangements and a step-by-step guide on how to get them.[88]

Third, Carroll got specific, repeated invitations to get information about licensing directly from publishers, but he refused to become informed. For example, Carroll ignored an email from a Sony publishing employee who offered to answer any questions about "a misunderstanding about custom licensing for show choir."[89] Carroll also ignored the advice of a television producer who urged him to contact publisher Hal Leonard to work out a licensing agreement.[90] Carroll had conversations with third-party defendant Josh Greene about custom arrangement licenses before Tresóna ever even came on the scene.[91] And in December 2011, the other high school show choir director in the District (the one who has consistently obtained custom arrangement

---

[85] Greenburg declaration ¶50.
[86] *Id*. at ¶52.
[87] *See* Exhibits K and L.
[88] *See* **Exhibit N**.
[89] Exhibit F at 288:24-289:17.
[90] Exhibit F at 303:7-23.
[91] Exhibit F at 51:3-53:9.

23

licenses), urged Carroll unsuccessfully to talk to Alison O'Donnell, an industry insider who could help Carroll get custom arrangement licenses.[92]

Perhaps most tellingly, Carroll ignored repeated requests from Tresóna to talk about these licensing issues.[93] In December 2014, almost immediately after discovering nearly 100 works infringed by Carroll, Tresóna sent a letter to Carroll regarding the infringement.[94] Carroll never responded to Tresona, but he wrote to Greene:

> my principal is not responding to the last email. he is ignoring him.
> i'm not sitting down with him. he's a crook.
> and his idiocy is distracting me from the wonderfully talented and eager
> high schoolers who want me to do my best to prepare for the winter season
> of competitions… those kids whose lives are changed for good by their
> participation in our special program that allows them to express themselves
> in ways they never dreamed of… so i am ignoring him too.[95]

In February 2015, his email to a colleague shows that his dislike for Mr. Greenburg is why he ignored Tresóna's efforts to discuss the issue:

> The guy [Greenburg] is an extortionist. He doesn't own the copyrights to
> anything yet he makes it sound like he is going to sue everybody. … If HE
> could sue schools, he would already do it. He's a major asshole. He's very
> aggressive and wants to scare people into giving him money. It's sick."[96]

In other communications, Carroll even expressed that he could violate copyrights with impunity because he was a teacher. He wrote: "i think it is interesting that i can't find one instance online where a teacher has been sued by a music company for anything copyright related… wonder why? lol."[97]

---

[92] *See* **Exhibit O**.
[93] Exhibit F at 79:12-82:17.
[94] *See* Exhibit A.
[95] Email from Brett Carroll dated December 16, 2014, *See* **Exhibit P**.
[96] Email from Brett Carroll dated February 15, 2015, *See* **Exhibit Q**.
[97] Email from Brett Carroll dated February 21, 2015, *See* **Exhibit R**.

Carroll was not confused about the law.  He thought he was immune to it. Carroll did not act reasonably and he is not entitled to qualified immunity.

**II.    Conclusion.**

For the reasons above, summary judgment on all issues should be denied.

RESPECTFULLY SUBMITTED this 5th day of December, 2016.

**DENTON PETERSON, P.C.**

/s/ Brad A. Denton
Brad A. Denton
1930 N. Arboleda Road, Suite 200
Mesa, AZ  85213
*Attorneys for Plaintiff, Tresóna Multimedia, LLC*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of December, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system which will send notification of said filing to the CM/ECF registrants.

A. Eric Bjorgum
Karish & Bjorgum, P.C.
119 E. Union Street, Suite B
Pasadena, CA 91103
*Attorney for Defendants Burbank High School Vocal Music Association,*
*Ellie Stockwell, Marianne Winters, Geneva Tarandek, Lorna Consoli,*
*Charles Rodriguez and respective spouses*

Aaron B. Craig
Atikinson, Andleson, Loya, Ruud & Romo
12800 Center Court Drive, Suite 300
Cerritos, CA 90703
*Attorney for Defendant Brett Carroll and respective spouse*

Christiane C. Kinney
LECLAIRRYAN, LLP
725 S. Figueroa Street, Suite 350
Los Angeles, CA 90017
*Attorneys for Third Party Defendants Josh Greene and Squareplay, Inc.*

William D. Chapman
Cadden & Fuller, L.L.P.
114 Pacifica, Suite 450
Irvine, CA 92618
*Attorney for Plaintiff*

/s/ Lindsey Rice

26